Opinion of tbe'court delivered by
Judge Catron.
The complainant, Scott, in bis original bill states, that in February, 1815, the sheriff of Maury county had an execution against him, for about $>1,000 dollars, and being unable to pay the sum without mortgaging or selling his slaves, he concluded to mortgage them, and applied to the defendant, and proposed to him to mortgage the slaves for the sum of $1,000, which Britton agreed to, advanced this sum, and complainant made an absolute bill of sale for the slaves, and delivered them to defendant, to wit: Ar-chy, Rachel and her three children, Nancy, Ned, and Hayden: that the five slaves were worth $2,000, at the time they were mortgaged, and that Wm. Bradshaw, the sheriff of Maury county, offered complainant $1,500 for them at that time, but complainant refused to take that sum.
He further states, that he had such unlimited confidence in the complainant, that he took no defeasance in writing, but relied Upon the parol, unwritten promise of the defendant, that the negroes should be returned when the money was refunded; and that complainant obtained possession of the negroes, under an express promise to *216 return thém when the sum of $1,000 should be refunded,' for which purpose no particular day was appointed, but it was expected to be done as soon as complainant could raise the money. In about nine months after the delivery of the negroes, (complainant alleges,) he did raise the money, and tendered the same to Britton, who refused to receive it, under pretext, that the time of redemption was past; with some other evasive pretext.
The bill was afterwards amended, by which it was al- • leged that the bill óf sale for Archy was made by Wm. Rutledge to defendant, and the bill of sale for Rachel and her three children, was made by Janies Scott, son of Complainant, who, it appeared, held the title to the slaves, by virtue of an execution sale of them as the property of complainant; but the bill alleges, they purchased them for the use and benefit of complainant; and that Rutledge and James Scott made the bills of sale at the request of defendant, who represented, that if the title was made in complainant’s name, they could again be levied upon by the sheriff, and sold as his property; and thereby’ put it out of the power of complainant ever to redeem.
The defendant answers to the original bill, that there were many transactions between complainant and him, which led to the transfer of the possession of the negroes 5 but admits the bill of sale from Rutledge and Jas Scott to him, copies of which he exhibits; that from Jas. Scott, da ted 19th Dec. 1811, and the one from Rutledge, dated 15th August, 1812. The one from James Scott is only for Rachel and Nancy, Ned and Hayden not haying been born in December 1811, when the bill of sale bears date; yet that this bill of sale was made in 1814, and antedated to overreach other conveyances; there is little doubt; and it is very probable that of Rutledge is also’ antedated.
Defendant admits that when he took the negroes from the complainant’s house, he told complainant if he would pay him his money in six or eight months from that time, he would still give up the negroes.
Defendant says it is untrue that the negroes were worth *217 2000 dollars. On the contrary, they were estimated by defendant and the neighborhood only to be worth 975 dollars, but in settlement he agreed to allow the complainant |>1000 for them.
Defendant at the time he told complainant that he would give up the negroes if he paid defendant his money, also told complainant he would greatl}, prefer his money.
Defendant positively denies that any tender of the money was made, as alleged in the bill, or that he set up any excuse: or that the money for redeeming the negroes was ever mentioned to him to be ready. If the money had been tendered, he would have surrendered the ne-groes, although years had elapsed since he had become connected with them.
Defendant states that some months after he got the ne-groes away from complainant’s possession, complainant and he made a settlement of the price of the negroes:— Rachel and her child were valued at 400 dollars, Arch at 400 dollars, Ned 100 dollars, and Hayden 75 dollars; The complainant asked the defendant to make the price 1000j to which the defendant absented* and the price was fixed at 1000 dollars.
In June 1816, (says the answer,) the complainant and defendant met together, and settled their former accounts, and the defendant fell in debt $254 65, to complainant, for which he gave his note, which is exhibited with the answer.
■ The answer expressly states, that thfe negroes were not worth more than 1000 dollars: he does not know what Bradshaw offered for the negroes.
It was not agreed that the negroes should be redeemable at the pleasure of the defendant, but only that he might redeem if the money was paid to complainant in six or eight months.
Defendant got the negroes into his possession in 1814 and 1815 — Arch in 1814, and the others in 1815, as well as he remembers.
Defendant states in the amended answer, that at the *218 time the negroes were delivered to him, he told and held . . . _ _ , . out to the complainant, that if he would in some reason-at,]e time, repay the principle sum with interest, and his trouble and expenses, he would let the complainant have the negroes; which promise, however, he conceived to he an honorary obligation only, but by which he felt himself bound as much as he would have done by his bond, or any the most solemn obligation: — that he still intended to comply with such verbal promise, so long as it existed. Afterwards, Bradshaw, the sheriff of Maury, complainant and Montgomery, came to the house of defendant, and represented that the negroes had been levied upon by Bradshaw as sheriff, before defendant took possession of them; that Montgomery had become security to a delivery bond that the slaves should he forthcoming at the day of sale, which was forfeited, and the security likely to be injured — the debt being about $600. That before this time the negroes did stand pledged for 500 dollars. The complainant then came to a settlement: they priced the negroes, and agreed that they were worth 1000 dollars, which price complainant agreed to take, and defendant to give; and .the business was, as defendant thought, finally ended ana liquidated; and for the balance agreed to be due, of 254 dollars 60 cents, defendant gave his note, which is dated 15th day of June, 1816. Defendant denies most positively, that since the settlement the complainant had any right to redeem the negroes, or that it was ever so agreed or understood, by repaying the principal and interest again for them, or in any way whatever. And that after the settlement, he (defendant) never believed or expected that there was any mortgage on said slaves.
Defendant further admits that complainant appeared to be much attached to the slaves, and defendant told him he did not want or need them; and if complainant wished to repurchase them, he should have them at a reasonable price; but defendant did not design or intend to convert his absolute purchase into a mortgage, nor did he then, nor does he yet believe he did so: but complainant. *219 came to defendant’s house, some time after the settlement, and stated to him, (defendant,) that he did for some time hope to be able to re-own said negroes, as he was much attached to them; but that he had then abandoned all idea of doing so, and that defendant might do the best he could with them; that defendant heard no more of the subject until the bill was filed.
The facts are stated with great confusion by the complainant, and almost as much so by the defendant. In these material points,however, they agree: that the principal contract of mortgage, or conditional sale, took place at the time that Bradshaw and Montgomery were present; 2dly, that 1000 dollars was the sum advanced for the five negroes; 3dly, that up to the time when Britton undertook to pay Bradshaw 600 dollars for Scott, the ne-groes were clearly redeemable, being only pledged for money; 4thly, that the bills of sale are absolute upon their faces; were given by James Scott and Rutledge, at the request of complainant and defendant, for the benefit of complainant, for whom, as naked trustees, James Scott and Rutledge held the negroes; and that as between defendant and complainant, the bills of sale were made in good faith.
There is no proof that the purchase money ever was tendered; and on this point the answer must be taken for true.
The complainant then shortly alleges that there was a parol condition to the bill of sale, (which was absolute upon its face,) that Scott should have liberty to redeem the five slaves, by refunding to Britton 1000 dollars at any time after the negroes were delivered to Britton.
The defendant rests himself upon two defences — first? he admits there was a condition to the absolute bills of sale, but says that he told defendant “he did not want or need the slaves, and if complainant wanted them, be might repurchase them in a reasonable time, to wit: in six or eight months; that this was the only extent of the condition. 2dly, defendant says that complainant came to his house after the settlement, and told him that he *220 had hoped to be enabled to redeem the slaves, but had abandoned all idea of doing so, and told defendant to do the best he could with them.
Here is a bill of sale, absolute upon its face, and can pnly be set aside upon clear and strong proof of a parol condition; and that the same was obtained by fraud, mistake or accident.
The complainant says, that the bills of sale were drawn without a written condition at the defendant’s request, who represented that if there was a condition, the ne-groes might be sold to satisfy the execution debts of Scott: this is denied in the answer, defendant insisting that the liberty to redeem was extended as a matter of honor on his part after an absolute sale.
The defendant’s witnesses prove that Britton said in conversation, that Scott had the privilege of redeeming the slaves; but whether such conversation took place before or after the time Bradshaw got the 600 dollar note, is in many instances uncertain.
James Gomel says, in 1813 or 1814, Britton told him, that when Scott paid the money, he was to have the ne-groes.
Clement Wall says, about a year after Britton got the negroes into possession, he was at the house of Britton, who asked him if he, (Wall) was going to redeem the negroes of Scott, as he (Britton) had understood Wall and Sam. Brown, intended doing so by the consent of Scott. Witness replied he did not intend to have any thing to do with the negroes. Britton said, if Scott intended to redeem, it was high time he had done it.
James Scott says, the negroes came to the possession of Britton about the 20th Jan. 1814.
Bradshaw says, it was some time in the year 1814, that the note was executed to him.
James M’Cracken says, in 1819, Britton told him the pegroes had once been redeemable, but the time had pass? ed, and they were not then redeemable.
Jane M’Elwee understood the negroes to be redeemable,
*221 Wm. Alexander also proves that Britton said the ne-groes were redeemable within six, eight or nine months after they came to the possession of Britton. This occurred about the time the bill was filed, when Britton. refused to receive the 1,000 dollars and give up the ne-groes.
Thomas M’Elwee says, he often heard Britton say, he wished Scott would come and redeem the negroes, if he ever intended to do so.
James Scott says, that he gave the bill of sale in Jan. 1814; that the negroes were then redeemable, as he understood from both parties; and since that time he conversed with Mr Britton once, and understood from Brit-ton, that they were redeemable in six or eight months; also understood from Scott and Britton, that the design was to leave the negroes for Scott, and Britton to be secured in the money he had loaned. The bill of sale made by witness, was antedated, having been made in 1814, and dated in 1811.
The above evidence is not materially contradictory of the answer.
James Sweet states, that in 1814, he was at the house of Britton, and asked him if he had bought Scott’s negroes; defendant replied not, but that he had taken a lien upon them for the use of $¡1000; that he had no wish to injure Scott; that he had taken the lien for the purpose of preventing others from selling Scott’s negroes, and whenever he could refund the money, he could have his negroes at any time, and all he wanted was his own money, and the negroes were only working for the use of his money, and all he wanted was to befriend Scott.
Witness says, Archy, in 1814, would have been worth 700 dollars; Rachel, about 30 years old, 500 dollars; Nancy, about five years old, 300 dollars; Hayden, one year old, worth from 200 to 250 dollars; making 2,050 dollars.
Reuben Bodwell and John Wortham, prove this witness entitled to no credit upon his oath in a court of justice.
*222 This is the material witness on the part of the complainant; and if it had been possible to have sustained his character, it would without doubt have been done. jje valued the negroes at 2,000 dollars in 1814, which either shows his ignorance or turpitude. The slaves were common field negroes, and worth between 1,000 and 1,300 dollars. This man’s evidence must he wholly rejected. The court has no alternative, when a witness states naked declarations, is unsupported by other strong concurring proof, and is directly attacked and not defended, but to disregard what he states. (10 Ves. 517, 18; 2 John Ch. Rep. 412.
The complainant took Wm. Bradshaw’s deposition, who proves that the 600 dollars paid him by Britton for Scott, was towards the payment of the negroes and land of Scott, which witness understood Britton had bought. Witness asked Scott what he was to get for the negroes; Scott told him about 1,000 dollars; witness told Scott if he would get back the negroes he would give him more for them, but dont recollect the sum he offered. Bradshaw suspected some underhand bargain between Scott and Britton.
Charles Dade testified that he came to live with Brit-ton in 1816, and left him in 1819; knew the negroes well; Archy was not a first rate fellow; he was far from it. He thinks 1,000 dollars was a fair price for the ne-groes in 1814.
John F. Mannin thought the negroes a hard bargain at 1,000 dollars, when Britton brought them home; says Archy was not healthy; subject to a pain in his breast and swelled knee.
John Wortham proves, that Scott acknowledged, when taking depositions with Britton, that the money never was tendered; the lawyers had put it in the bill, that he never had said so.
James Britton says, about 18 months or two years after Joseph Britton, the defendant, brought the negroes home from Scott’s, the latter came to the house of defendant, and in conversation Scott said he would be very glad *223 to redeem the negroes, hut as he had put it out of his ® power to own them himself, he had rather the said Brit-ton should own them than any body else, as he had paid as much for them as he believed he could have sold them for to any body else; that he was perfectly satisfied, that Britton was entirely welcome to the negroes, and wished him to do the best he could with them; that defendant had been at a great deal of trouble one way and another, for him, complainant. Witness further states, that some time in 1816, Scott came to Britton and requested him to give him up the lien he had on a tract of land of Scott’s for apart of the 600 dollars paid Bradshaw by Britton; which Britton did do, and took Scott’s note of hand for the money, a copy of which is annexed to the answer. Scott told deponent afterwards, that he and Britton had made a final settlement; that Scott had lifted the lien on the land, and executed his note to Britton for the balance he was owing him on a final settlement.
From this proof, was it the intention of the parties that this should be a mortgage, and of course not affected by ^forfeiture? Or was it a purchase with liberty to re-purchase in 6 or 8 months?
A court of equity allows redemption on a general principle adopted by the court of relieving against all forfeitures where compensation can be made. (1 Call, 254, per Pendleton, Judge.
But if it is a defeasible purchase, the condition must be strictly performed at the day, or no relief will he granted, because it does not admit of compensation for the risk. If the thing perish the next moment it must he the loss of the purchaser, he having no covenant, or even implied promise for the return of the money in that event; and we are taught by a maxim in equity, that in these casual cases, eventual loss or gain must accrue to, or fall on him who runs the risk. Chapman’s adm. vs. Turner, (1 Call 255. 7 Cranch 227. The court must be governed by the real intention of the parties: In ascertaining this intention there are two circumstance of great weight; 1st. Was there a full price paid for the article claimed to have *224 mortgaged? (1 Call. 250. 4 Hen. and Mun. 101, 112. 7 Cr. 241. 2nd. Was there a covenant to secure the loaned money, and the pledge only a 'collateral security? (Pow. M. 172.
The price in 1814 was very nearly full; and with it iri 1816, Scott expressed himself perfectly satisfied, as wé are told by James Britton, which circumstance is of great weight, to shew this a purchase with liberty to repurchase in 6 or 8 months, as stated in the answer.
Britton took no covenant to secure the mortgage money. If this farming man had understood he had loaned the large sum of a thousand specie dollars, (and he proves he paid the dollars at his own house,) he assuredly would have had some bond plainly securing it, and thus effect a speedy and easy recovery thereof, without a suit in equity; this is probable, to say the least;
Suppose after 1816, the slaves had all died, and then Britton had sued Scott for the 1,000 dollars in assumpsit, could he have recovered the money from Scott? If he' could not, then this was a purchase, by Britton, with a liberty to repurchase by Scott; for the pledge of the ne-groes to secure the debt could not be noticed in law. — • The pledge is merely collateral security with the obligation to pay off the mortgage; Or suppose after 1816, Britton had kept the negroes in his possession, and sued Scott at law for the 1,000 dollars and interest, could he have recovered? No man in his senses would have brought, or advised the bringing of such a suit, yet it is the best that can be applied to this cause, for if the bills of sale imported only a mortgage, they would have been evidence of a collateral security, and not a sale 'of the negroes in discharge of the 1,000 dollar debt, due from Scott to Britton, and therefore no defence.
Scott told Bradshaw he had sold the negroes to Britton, for 1,000 dollars. James Britton expressly proves that the sale was conditional, as stated in the answer, that the time, (6 or 8 months,) for the repurchase, or redemption as it is expressed, had expired; that Scott instructed Brit-ton to do the besthe could with them.
*225 Imposing as the proofs in this cause presented themselves on the first reading, yet it is remarkably true, that not one syllable of proof can be found in the evidence, to contradict this witness, whose testimony is conclusive if true, and there is not the least circumstance calculated to raise a doubt oí its verity. He proves an express abandonment of his right, on the part of Scott, in 1816, which is of itself a good defence. The condition being parol, Scott could waive it by such evidence. (1 Call, 255.
My inclinations were strongly in favour of a decree for the complainant when the proofs were first opened, but on a minute examination, the preponderance in fa-vour of the defendant is very decided. Instead of clear and strong proof to support the allegations in the bill, aside from Sweet’s it is weak, uncertain and confused.—
James Britton directly supports the answer, is supported by Bradshaw’s evidence and many strong concurring circumstances. I think the bill must be dismissed.
Bill dismissed.